[Cite as *State ex rel. Cordray v. Tri-State Group, Inc.*, 2011-Ohio-2719.]
STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, ex rel. RICHARD CORDRAY, OHIO ATTY. GENERAL, | ) ) ) | |
| PLAINTIFF-APPELLEE, | ) ) | |
| VS. | ) ) | CASE NO. 07-BE-38 |
| TRI-STATE GROUP, INC., et al. | ) ) ) | OPINION |
| DEFENDANTS-APPELLANTS. | ) ) | |

CHARACTER OF PROCEEDINGS:    Civil Appeal from Court of Common
                             Pleas of Belmont County, Ohio
                             Case No. 00CV0180

JUDGMENT:                    Affirmed

APPEARANCES:
For Plaintiff-Appellee       Timothy J. Kern
                             Assistant Attorney General
                             Environmental Enforcement Section
                             30 East Broad Street, 25th Floor
                             Columbus, Ohio 43215

For Defendants-Appellants    Attorney Larry A. Zink
                             3711 Whipple Avenue, N.W.
                             Canton, Ohio 44718-2933


JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Mary DeGenaro


Dated: June 3, 2011

DONOFRIO, J.

{¶1} Defendants-appellants, Tri-State Group, Inc. and Glenn Straub, appeal from Belmont County Common Pleas Court judgments finding them in contempt and imposing a $247,590 penalty for failing to comply with a previously issued permanent injunction and determining the amount appellants spent in reasonable costs to purge the contempt.

{¶2} Some background information is helpful here. This case was previously before us in *State v. Tri-State Group, Inc.*, 7th Dist. No. 03-BE-61, 2004-Ohio-4441. Therein, we set out the following pertinent facts:

{¶3} "Tri-State is an Ohio corporation fully owned by Straub. Straub is also the sole shareholder of at least two other Ohio corporations, Ohio River Sand & Gravel and Burrell Industries. In the early 1980's, Tri-State applied for a Permit to Install (PTI) a flyash disposal site. Flyash is a waste product produced in certain industries which, for regulatory purposes, is designated as non-toxic and non-hazardous, but contains heavy metals in amounts sufficient to contaminate surrounding water supplies. Nevertheless, the Ohio Environmental Protection Agency (OEPA) has approved some beneficial uses for flyash. The proposed location for the flyash disposal site was an old sand and gravel pit on property owned by Ohio River Sand & Gravel and was next to an Ohio Edison plant that produced flyash.

{¶4} "The proposed site was also located above an aquifer. That aquifer is an excellent source of drinking water and is one of the most productive types of aquifers in the State of Ohio. There was no natural barrier between the proposed site and that aquifer. To ensure that the flyash did not contaminate that groundwater source, the OEPA required that Tri-State install a protective liner, a wastewater disposal system, and ground water monitor wells. The PTI further set forth requirements for closing the site after it had been filled.

{¶5} "Tri-State was also required to apply for a National Pollutant Discharge Elimination System (NPDES) permit in order to discharge the leachate into a settling pond. The NPDES permit required that Tri-State conduct monthly tests of the ground water monitor wells and report the results of those tests to the OEPA in monthly

operating reports (MORs). The OEPA personnel would then review these MORs for signs of contamination. As the OEPA personnel explained, it employed a self-reporting system to check for groundwater contamination.

{¶6} "After reviewing Tri-State's proposals, the OEPA issued the PTI on May 30, 1985, and the NPDES permit on December 12, 1985. * * *

{¶7} "Tri-State accepted flyash from the nearby Ohio Edison plant in 1985 and 1986. * * *

{¶8} "In November 1988, a landslide washed out a portion of the flyash pit. Soon after the washout, Straub appeared onsite to direct the cleanup and authorized remedial efforts to prevent another washout. For example, he ordered that his employees build a reinforced embankment to guard against further washouts and authorized the placement of collection tanks to collect the leachate from the site given the fact that the washout damaged the wastewater treatment system. Straub testified that he knew the tank collection system was a temporary system, but he never sought approval of that system from the OEPA and never replaced that system with another one in compliance with the PTI. The washout also destroyed one of the ground water monitor wells and that well was never replaced.

{¶9} "Over time, more problems occurred at the site. For instance, most of the remaining ground water monitor wells were either destroyed or left capless, rendering their results invalid. Since Tri-State did not properly maintain the ground monitoring system, the OEPA could not determine whether the flyash site was contaminating the aquifer. After the washout, the OEPA began notifying Tri-State that it was not complying with its permits and repeatedly asked Tri-State to do so. Tri-State refused.

{¶10} "Tri-State never capped the site in accordance with the PTI. That permit required that Tri-State use a particular type of synthetic cover to cap the site. At one point, Tri-State placed asphalt grindings on the site and in either 1992 or 1993 it covered the site with an uneven layer of soil. At the time of trial, Tri-State had done nothing more with the site and vegetation was growing on it.

{¶11} "In 1996, Tri-State sold most of its assets. After this, it was no longer an operating company. Nevertheless, Tri-State was still obligated to maintain the flyash site. * * *

{¶12} "After the sale, Tri-State had substantial assets. In 1997, Tri-State had $10,478,400 in assets. Between 1997 and 2000, Tri-State distributed two million dollars to Straub, paid his daughters' company 1.9 million dollars in management fees, and loaned the bulk of the remainder to other companies affiliated with Straub at no interest with no assurances that the money would be repaid. By the end of 2000, Tri-State's assets were $6,606,546.

{¶13} "On May 4, 2000, the State filed a complaint for injunctive relief and a civil penalty against both Tri-State and Straub. * * *

{¶14} "* * *

{¶15} "The matter proceeded to a bench trial on three issues: 1) the terms of a permanent injunction; 2) the appropriate civil penalty for noncompliance with the permits; and, 3) Straub's individual liability for the noncompliance. The trial court eventually filed two entries. In the first entry, it set forth its findings of fact and conclusions of law. The trial court's second entry was its judgment entry ordering the permanent injunction, assessing the civil penalty, and finding Straub individually liable for the noncompliance with the permits." Id. at ¶¶2-14.

{¶16} On appeal, we affirmed the trial court's judgment. The September 2, 2003, judgment assessed a civil penalty, jointly and severally, of $362,185 against Tri-State and Straub, with ten percent interest to accrue from the day of the judgment entry (first civil penalty). It further permanently enjoined appellants from continuing the operation of the flyash disposal site and from continuing violations of R.C. 6111.07(A). And it provided that if appellants did not immediately and in good faith comply with the injunction, additional per-day civil penalties would accrue from the date of the judgment entry.

{¶17} On March 2, 2007, the state filed a motion to show cause why appellants should not be held in contempt for failing to comply with the terms of the

injunction.  Specifically, it alleged that appellants (1) failed to implement a closure of the site; (2) failed to submit a hydrogeological investigation report and a ground water monitoring plan and to implement ground water monitoring at the site; (3) failed to pay the civil penalty and interest; and (4) failed to pay the additional per day civil penalty.

**{¶18}**  The court held a hearing on the show cause motion.  It heard testimony from Abbot Stevenson, an OEPA Specialist; Janet Jacobs, a hydrogeologist; and Straub.  The court found, in its August 27, 2007 judgment entry, that appellants violated five subparagraphs of Paragraph II of the permanent injunction, those being:

**{¶19}**  "(E) Submittal of a post closure plan to assure proper installation and growth of the vegetative cover;

**{¶20}**  "(F) Submittal of a proposal (which must be approved by the OEPA) for erosion controls;

**{¶21}**  "(G) Submittal of a proposal (which must be approved by the OEPA) for leachate controls;

**{¶22}**  "(H) Re-establishment of the ground water monitoring system and replacement of destroyed and/or non-functioning wells (the final configuration and amount of wells to be approved by OEPA upon hydrogeologic evaluation).

**{¶23}**  "(I) Imposition of deed restriction to control use of property for industrial purposes only."

**{¶24}**  The court further found that appellants violated its order by failing to close the site within 12 months of the September 2, 2003 judgment and by failing to provide a report from a professional engineer certifying closure work to be in accord with the court-ordered OEPA closure plan.  And the court found appellants failed to install, implement, maintain, and monitor for contaminants, a ground water monitoring system in accordance with Paragraph IV, subparagraphs (A), (B), (C), (D), (E), and (F) of the September 2 judgment entry.

**{¶25}**  Consequently, the court found appellants jointly and severally liable for civil contempt of court.  The court imposed a jail term on Straub to begin on

November 26, 2007 and to continue indefinitely until all requirements for closure of the site and for installation, implementation, and maintenance of the new ground water monitoring system were completed as set forth in the September 2, 2003 judgment entry. The court noted the sentence was conditional and that Straub would be free if appellants agreed to do as ordered. The court also found appellants jointly and severally liable for an additional civil penalty of $210 per day, from June 4, 2004, through August 27, 2007 (1,179 days x $210 = $247,590) with interest (second civil penalty).

{¶26} Appellants filed a timely notice of appeal from the contempt judgment on September 18, 2007.

{¶27} On February 27, 2008, this court put on an entry ordering this appeal to be held in abeyance pending resolution of all claims and final adjudication by the trial court.

{¶28} On August 25, 2008, the trial court held a hearing on the deed restriction to be applied pursuant to its September 2, 2003 judgment entry.

{¶29} On October 24, 2008, this court continued the period of abeyance pending further orders resolving all issues by the trial court.

{¶30} On March 2, 2009, the trial court issued its judgment entry ordering the recording of the deed restriction.

{¶31} On April 23, 2010, the trial court issued its judgment entry after a "final hearing" to resolve: (1) the issue of the amount of reasonable costs expended by appellants in accomplishing the court-ordered clean-up objective to assure Closure of the Site and installation, implementation and maintenance of the Ground Water Monitoring System; and (2) to determine the total amount of appellants' second civil penalty totaling $247,590, with accrued interest, and the amount of costs to purge the second civil penalty. The court determined that appellants' second civil penalty, assessed on August 27, 2007, plus post-judgment interest accruing from June 4, 2004 to November 4, 2009, totaled $354,875. The court then credited appellants $158,459.70 for reasonable costs they expended to accomplish the court-ordered

clean-up objectives, which were to be applied dollar-for-dollar to purge the second civil contempt penalty. Thus, the court found the balance of appellants' second civil contempt penalty to be $196,415.30. The court ordered the balance of the second civil contempt penalty along with the balance owing from the first civil contempt penalty ($194,508.00) to be filed as a judgment lien against appellants.

{¶32} On May 17, 2010, this court returned the case to the active docket.

{¶33} On May 19, 2010, appellants filed a timely notice of appeal from the trial court's April 23 judgment entry.

{¶34} On June 7, 2010, this court consolidated the two appeals.

{¶35} In appellants' first appeal from the August 27, 2007 contempt judgment, they raise four assignments of error. Their first assignment of error states:

{¶36} "THE TRIAL COURT ERRED IN ENTERING ITS ORDER OF CONTEMPT AND IMPOSITION OF A 'CIVIL PENALTY' IN THE AMOUNT OF $247,590 WITH NO OPPORTUNITY TO FULLY PURGE, WHICH ORDER IS CRIMINAL IN NATURE, WHEN THE COURT FAILED TO FIND THE DEFENDANTS GUILTY BY THE STANDARD OF BEYOND A REASONABLE DOUBT."

{¶37} Appellants argue that the trial court found them guilty of criminal contempt yet failed to use the criminal contempt standard of proof. They assert that the court never made a finding that they were guilty of contempt "beyond a reasonable doubt." Appellants further contend that their penalty is punitive in nature. They assert that the contempt penalty does not afford them an opportunity to purge the second civil penalty because they can only purge it to the extent that they could do so in 90 days. They further point out that the penalty ($210/day) was three times the penalty requested by the state ($70/day).

{¶38} Contempt is generally classified as either civil or criminal. Courts tend to distinguish civil and criminal contempt by the character and purpose of the sanction imposed. *Brown v. Executive 200, Inc.* (1980), 64 Ohio St.2d 250, 253. A sanction, whether imposed for civil or criminal contempt, contains an element of punishment. Id.

{¶39} In *ConTex, Inc. v. Consolidated Technologies, Inc.* (1988), 40 Ohio App.3d 94, 95-96, the court elaborated on this distinction as follows:

{¶40} "The purpose of criminal contempt sanctions is to vindicate the authority of the court, and to punish past acts of disobedience. The penalties imposed on a criminal contemnor are unconditional, and may take the shape of an absolute fine for a specific amount or a determinate period of confinement.

{¶41} "The purpose of sanctions imposed for civil contempt is to coerce compliance with the underlying order or to compensate the complainant for loss sustained by the contemnor's disobedience. Punishment for civil contempt may, therefore, be either: (1) remedial or compensatory in the form of a fine to compensate the complainant for the contemnor's past disobedience; or (2) coercive and prospective, i.e., designed to aid the complainant by bringing the defendant into compliance with the order, and conditional, wherein confinement may be terminated by the contemnor's adherence to the court's order."  (Internal citations omitted).

{¶42} The standard of proof for civil contempt is clear and convincing evidence.  *Brown*, 64 Ohio St.2d at 253.  Yet the standard of proof required for criminal contempt is proof beyond a reasonable doubt.  Id. at 251.

{¶43} In this case, the trial court stated that it found appellants guilty of civil contempt:

{¶44} "[Appellants] are jointly and severally liable for Civil Contempt of this Court.  Therefore, the appropriate punishment is determined to be remedial or coercive and for the benefit of the Complainants (State of Ohio/Belmont County). The prison sentences are conditional.  Tri-State Group. Inc., and/or Glenn Straub carry the keys of their prison in their own pocket since they will be freed if they agree to do as Ordered. * * *

{¶45} "* * *

{¶46} "In the event Defendants would choose to purge themselves from Civil Contempt, to avoid an indefinite jail sentence, by proceeding, in good faith, to Closure of the Site in accord with the Court Ordered OEPA Approved Closure

requirements and to install, implement, and maintain a new Ground Water Monitoring System at the site, this Court shall allow the application of reasonable costs expended by Defendants in accomplishing such objectives to be applied to reduce the above-mentioned Civil Penalty, dollar for dollar, but only in the event such costs are expended within the next ninety (90) days (November 26, 2007), and 'good faith' compliance is demonstrated to this Court." (August 27, 2007 judgment entry).

{¶47} The court scheduled a review for 90 days at which time it would review appellants' compliance with its order and further suspend the jail sentence with reviews to continue every 90 days until the site was properly closed.

{¶48} The court found appellants guilty of civil contempt and, therefore, the clear and convincing standard of proof applied.

{¶49} The jail sentence is clearly a civil contempt penalty. The court specifically ordered appellants (although practically speaking this applied only to Straub) to be jailed indefinitely until all requirements for the Site Closure and the installation, implementation, and maintenance of the new Ground Water Monitoring System were completed. The court further stated that it would review the matter every 90 days and as long as appellants were in compliance with the court's order, it would suspend the jail sentence. Thus, the indefinite jail term was clearly meant to coerce appellants into complying with the court's order.

{¶50} The civil penalty of $247,590 likewise is a civil, rather than a criminal, contempt penalty. The court gave appellants the opportunity to purge this penalty dollar-for-dollar by the amount that they expended to fully implement the Site Closure and Ground Water Monitoring System. This should have been an excellent incentive to "light a fire" under appellants' feet so to speak to spend the money needed to comply with the court's order. This dollar-for-dollar offer was specifically designed to aid appellee by bringing appellants into compliance with the court's order.

{¶51} Further, the fact that the second civil penalty was more than the penalty requested by appellee does not make it a criminal penalty. The court noted that the first civil penalty it assessed against appellants was $70/day, which was the amount

requested by appellee here. It then pointed out that after it imposed that penalty, appellants went on to disregard the Site Closure and failed to implement the Ground Water Monitoring System. Therefore, the court stated, it chose to impose a heftier penalty this time in the amount of $210/day. The $70/day civil penalty failed to induce appellants' compliance with the court's order. Therefore, it was reasonable for the court to increase the penalty in hopes that a steeper penalty, which it gave appellants the opportunity to purge dollar-for-dollar with compliance, would in fact coerce them into compliance. Additionally, the court had the authority to fine appellants up to $10,000/per day. R.C. 6111.09(A). Thus, the fine chosen by the court was considerably less than the maximum permitted by law.

{¶52} Based on the foregoing, the trial court properly classified the contempt as civil contempt. Therefore, it was not required to find appellants guilty by the proof beyond a reasonable doubt standard. Accordingly, appellants' first assignment of error is without merit.

{¶53} Appellants' second assignment of error states:

{¶54} "WHETHER THE CONTEMPT IS CRIMINAL OR CIVIL IN NATURE, THE TRIAL COURT ERRED IN IMPOSING THE BURDEN OF PROOF ON THE DEFENDANTS AND NOT ON THE MOVANT."

{¶55} The trial court held a hearing on August 27, 2007, at which time it read its eight-page judgment entry finding appellants in contempt into the record. After it did so, the court spent some time discussing the judgment entry with counsel. At one point it stated:

{¶56} "Now, in regard to the burden in this case, the burden of proof was on the defendant[s] to demonstrate compliance with the court order. And the defendants have failed to demonstrate that compliance." (Aug. 27, 2007, Tr. 27).

{¶57} Appellants now argue that the court erred in placing the burden on them. They cite to the above sentence in support.

{¶58} In a civil contempt proceeding, the initial burden is on the movant to prove by clear and convincing evidence that the other party violated a court order.

*Carroll v. Detty* (1996), 113 Ohio App.3d 708, 711, citing *Brown*, 64 Ohio St.2d 250. Once the movant has met this burden and established a prima facie case by clear and convincing evidence, the burden shifts to the non-moving party to either rebut the initial showing of contempt or establish an affirmative defense by a preponderance of the evidence. *Young v. Young* (May 7, 2001), 7th Dist. No. 00-BA-8, citing *Pugh v. Pugh* (1984), 15 Ohio St.3d 136, 140.

**{¶59}** When reading the sentence relied on by appellants, it may appear as if the court improperly placed the burden of proof on appellants. However, a further reading of the court's comments reveals that was not what the court did.

**{¶60}** The court elaborated on its burden comment, stating:

**{¶61}** "As I said, it was Defendant's duty and burden to comply - - excuse me, * * * it was the defendant's burden to comply with the orders of the court, and it was the OEPA's duty to enforce them if they found that they weren't being complied with. Both sides have failed Belmont County." (Aug. 27, 2007, Tr. 30-31).

**{¶62}** Thus, when the court was referencing appellants' burden, it did not mean their burden to prove they were not in contempt. Instead, the court was trying to emphasize that when it puts an order on, both parties must see that it is followed.

**{¶63}** Further evidence that the court applied the correct standard in this case is seen in the court's comment: "The Court finds, by clear and convincing evidence, that the defendants are in contempt, civil contempt." (Aug. 27, 2007, Tr. 28). This comment demonstrates that the court weighed all of the evidence and determined that appellants violated its order while applying the appropriate burden of proof. And once appellee met this clear and convincing evidence standard, the burden shifted to appellants to rebut it or defend against it.

**{¶64}** Accordingly, appellants' second assignment of error is without merit.

**{¶65}** Appellants' third assignment of error states:

**{¶66}** "THE TRIAL COURT ERRED IN IMPOSING A 'CIVIL PENALTY' OF $247,590 AGAINST THE DEFENDANTS, JOINTLY AND SEVERALLY, IN THAT THE 'CIVIL PENALTY' VIOLATES THE EIGHTH AMENDMENT OF THE UNITED

STATES CONSTITUTION AND ARTICLE I SECTION 9 OF THE OHIO CONSTITUTION PROHIBITING EXCESSIVE FINES."

**{¶67}** Appellants argue here that the court's fine of $247,590 was excessive. The only support appellants offer is the fact that the state requested a fine of $88,350.

**{¶68}** The Excessive Fines Clause of the Eighth Amendment does not apply to civil contempt sanctions. *Sullivan v. Curry*, 2d Dist. No. 23293, 2010-Ohio-5041, at ¶50; *Ohio Elections Comm. V. Ohio Chamber of Commerce & Citizens for a Strong Ohio*, 158 Ohio App.3d 557, 2004-Ohio-5253, at ¶33. Thus, the fine in this case did not violate the constitutional ban on excessive fines as appellants allege.

**{¶69}** Furthermore, the civil penalty was not excessive.

**{¶70}** A trial court has broad discretion in determining the amount of a civil penalty according to R.C. 6111.09. *State ex rel. Celebrezze v. Thermal-Tron, Inc.* (1992), 71 Ohio App.3d 11, 19. Thus, we will not disturb its decision absent an abuse of discretion. Abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's judgment was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

**{¶71}** "When determining the appropriate amount of a civil penalty, the trial court should consider the following factors: 1) the harm or threat of harm posed to the environment by the person violating R.C. 6111.07; 2) the level of recalcitrance, defiance, or indifference demonstrated by the violator of the law (also referred to in case law as the defendant's good or bad faith); 3) the economic benefit gained by the violation; and, 4) the extraordinary costs incurred in enforcement of R.C. 6111.07. While making this determination, the trial court must remember that because a civil penalty is an economic sanction designed to deter violations of R.C. Chapter 6111, the penalty must be large enough to hurt the offender." (Internal citations omitted.) *State v. Tri-State Group, Inc.*, 7th Dist. No. 03-BE-61, at ¶104.

**{¶72}** The trial court cited to these factors in determining the appropriate civil penalty. It further found that appellants knowingly, recklessly, and contumaciously

disregarded the court's orders to close the site and implement a new ground water monitoring system. The court cited this disregard as the reason for increasing the civil penalty from $70/day to $210/day. Consequently, the court found that $210/day was appropriate. The court also set out its formula for reaching its total penalty: number of days of violations (1,179) x $105 per day per each of the two permits violated (PTI Permit and NPDES Permit) = $247,590.

{¶73} Based on the above, we cannot conclude that the trial court abused its discretion in setting appellants' civil penalty. It considered the appropriate factors, it considered appellants' disregard for its prior order, and it came up with and applied an appropriate formula. Accordingly, appellants' third assignment of error is without merit.

{¶74} Appellants' fourth assignment of error states:

{¶75} "THE TRIAL COURT ERRED IN IMPOSING CIVIL PENALTIES AGAINST THE DEFENDANTS FOR THE TIME PERIOD PRIOR TO FEBRUARY 24, 2006 WHEN THE STATE OF OHIO AND TRI-STATE ENTERED INTO A SETTLEMENT AGREEMENT RESOLVING ALL MONETARY CLAIMS AGAINST THE DEFENDANTS FOR PENALTIES AND FINES."

{¶76} Appellants argue that the Settlement Agreement they entered into with appellee on February 24, 2006, barred any civil penalty before that date. The Settlement Agreement provides in pertinent part:

{¶77} "WHEREAS, it is the intention of the parties hereto to resolve any and all monetary claims asserted against Tri-State and Straub as a result of a certain Judgment Entry dated September 2, 2003 * * *

{¶78} "* * *

{¶79} "3) This Settlement Agreement shall be a full and complete satisfaction and release of all monetary claims against the Defendants in the above captioned lawsuit including claims for sums of money due, accounts, judgments, damages, penalties, fines, interest, executions, claims and demands whatsoever which the

State of Ohio has against the Defendants in connection with all monetary matters and issues raised against said Defendants in the above captioned case."

**{¶80}** Appellants argue that by imposing the second civil penalty from June 4, 2004, the trial court included 625 days prior to the settlement date of February 24, 2006, which it should have excluded. They assert that these 625 days resulted in $131,250 of the second civil penalty.

**{¶81}** The trial court addressed this issue in its August 27 judgment:

**{¶82}** "In order that the record will clearly evidence the Court's reasoning herein, the Court finds that the imposition of this Civil Penalty is separate and distinct from the Civil Penalty imposed by the Court in the amount of three hundred sixty-two thousand one hundred eight-five dollars ($362,185.00), **which penalty was subsequently compromised, without the approval of this Court**, by a settlement agreement between Plaintiffs and Defendants, and which settlement evidence an unpaid Civil Penalty balance in the amount of one hundred ninety-six thousand thirty-six dollars ($196,036.00). Rather, this Civil Penalty is imposed for the direct violation of this Court's Order for Defendants to comply with the OEPA Approved Closure Plan and the installation, implementation and maintenance of a Ground Water Monitoring System and the agreement between the parties to compromise the original Civil Penalty imposed by the Court, in no manner, affects this Civil Penalty for Defendants' knowing, reckless, and contumacious violations of this Court's Order for injunctive relief." (Emphasis sic.)

**{¶83}** At the time the parties entered into the Settlement Agreement, appellants had the $362,185 first civil penalty due and owing. Per the terms of the Settlement Agreement, appellants agreed to pay $162,500 immediately and the remaining $200,000 upon their sale of certain inventory. Further, at this time although it seems appellants were not complying with the trial court's September 2, 2003 judgment, appellee had not yet filed a show cause motion. In fact, appellee did not file its motion to show cause until March 2, 2007, a year after the parties signed the Settlement Agreement. Thus, at the time the parties entered into the Settlement

Agreement the only claim appellee had against appellants and the only penalty appellants had assessed against them was for the first civil penalty in the amount of $362,500 as set out in the September 2, 2003 judgment.

**{¶84}** The Settlement Agreement does not bar the trial court's second civil penalty, which the court determined started to accrue on June 4, 2004. The reason the court picked June 4, 2004, as the start date for the penalty was because this was the first day after the nine months it had allotted for the re-implementation of the ground water monitoring system. Accordingly, June 4 was the first day appellants were in contempt of the court's order.

**{¶85}** The Settlement Agreement clearly states that its purpose is to resolve "any and all monetary claims" against appellants as a result of the September 2, 2003 judgment. The second civil penalty, however, was not a result of the September 2 judgment. Instead, it was a result of appellants' disregard of that order and its failure to comply with its terms.

**{¶86}** Furthermore, the September 2 judgment had two main components: (1) the first civil penalty; and (2) the injunctive relief requiring Site Closure and Ground Water Monitoring. The Settlement Agreement, by its terms, applied only to "monetary claims." Thus, it dealt only with the civil penalty. It did not operate to settle or change the injunction terms requiring the Site Closure and Ground Water Monitoring. And because the second civil penalty was a result of appellants' contemptuous conduct in disregarding the terms of the injunction, the resulting second civil penalty is not barred by the Settlement Agreement.

**{¶87}** Accordingly, appellants' fourth assignment of error is without merit.

**{¶88}** In its second appeal, appellants raise three additional "points," which are essentially assignments of error. Thus, we will treat them as such and continue as if they were appellants' fifth, sixth, and seventh assignments of error. Appellants' fifth assignment of error states:

**{¶89}** "THE TRIAL COURT ERRED IN IMPOSING, WHAT IS IN EFFECT, A STATUTORY ENVIRONMENTAL COVENANT ON ALL 132 ACRES OF REAL

PROPERTY OWNED BY TRI-STATE WHEN THE FLY ASH DISPOSAL SITE WAS APPROXIMATELY FIVE (5) ACRES."

**{¶90}** On March 2, 2009, the trial court ordered that appellants record the deed restriction submitted by appellee. The flyash disposal site is limited to approximately five acres of appellants' property. But the deed restriction applies to all 132 acres of appellants' property, including the five flyash acres. The deed restriction applies in perpetuity to the disposal site and to a buffer zone to be determined by the court. The deed restriction applies to the remainder of the property for at least five years after commencement of the ground water monitoring or until April 30, 2013. At that time, appellants may make a request to the OEPA and the court to exclude the remaining property from the deed restriction.

**{¶91}** Appellants argue that the deed restriction should only apply to the five acres of property where the flyash site is located and not to all 132 acres of their property. In support, they point to the testimony of Michael Kearns who referenced the location of the flyash site and the southeast water flow as set forth in Defendant's Exhibit 2. Defendant's Exhibit 2 is a map for the site depicting water flow to the southeast, which is away from the remaining Tri-State acreage. And they contend that appellee offered no reason why the restriction should apply to the entire 132 acres.

**{¶92}** Appellants essentially argue here that the trial court's determination that the deed restriction applies to all 132 acres is against the manifest weight of the evidence.

**{¶93}** "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, at the syllabus. See, also, *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 226. The court "must indulge every reasonable presumption in favor of the lower court's judgment and finding of facts." *Gerijo*, 70 Ohio St.3d at 226, (citing *Seasons Coal Co., Inc. v. Cleveland* [1984], 10 Ohio St.3d

77). "In the event the evidence is susceptible to more than one interpretation, [the court] must construe it consistently with the lower court's judgment." Id. The rationale of giving deference to the findings of the trial court is that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations to weigh the credibility of the proffered testimony. *Seasons Coal Co.*, 10 Ohio St.3d at 80.

{¶94} The trial court heard testimony from several witnesses on the subject of whether the deed restriction should apply to the entire 132 acres or only to the five-acre disposal site.

{¶95} Michael Kearns is a civil engineer with a firm that was hired to do work on the site closure plan. Kearns stated that as part of the closure plan a Mr. Siplivy prepared a hydro-geologic report. (Aug. 25, 2008, Tr. 40). He also identified Defendant's Exhibit 2, which is an underground mine map that shows the ground water movement under the site. (Aug. 25, 2008, Tr. 42). This exhibit was part of the closure plan that was accepted by the OEPA. (Aug. 25, 2008, Tr. 45). Kearns testified that given the readings he had monitored on the wells, the water flow went to the southeast. (Aug. 25, 2008, Tr. 43-44). He stated that the disposal site was located in the northeast corner of appellants' property. (Aug. 25, 2008, Tr. 43). Kearns testified that in his opinion, the deed restriction should only apply to the five-acre disposal site. (Aug. 25, 2008, Tr. 48). He stated this was because he did not think it was reasonable to hold the deed restriction to the whole 132 acres when only five acres posed an environmental danger. (Aug. 25, 2008, Tr. 48-49). Kearns further stated that because the disposal site was located in the northeast portion of the property and the water flowed to the southeast, the remaining 132 acres would not be affected by what was going on in the northeast corner. (Aug. 25, 2008, Tr. 51). On cross-examination, Kearns acknowledged that he was not the person who prepared the hydro-geologic report. (Aug. 25, 2008, Tr. 53).

{¶96} Jane Jacobs, the OEPA ground water expert, also testified on the subject. She stated that she approved Defendant's Exhibit 2 as part of the hydro-

geologic assessment report. (Aug. 25, 2008, Tr. 61). But she testified that it is only an underground workings map that shows an underground mine. (Aug. 25, 2008, Tr. 61-62). This is different, she explained, from a potentiometric map, which shows ground water flow. (Aug. 25, 2008, Tr. 61-62). Jacobs testified that Defendant's Exhibit 2 shows the dip of the bedrock but it is incorrect to say that the water flow follows the dip in a sand and gravel aquifer. (Aug. 25, 2008, Tr. 62-63).

**{¶97}** Jacobs further expressed concern that flow from the disposal site could migrate to the rest of appellants' property. (Aug. 25, 2008, Tr. 65). She stated that based on the difference in elevation between the monitoring wells, the ground water could flow from the disposal site to other parts of appellants' property. (Aug. 25, 2008, Tr. 65, 75-77). Additionally, she testified that during the five-year monitoring period, it was possible for the ground water flow to change. (Aug. 25, 2008, Tr. 66). Jacobs went on to testify that it would take the entire five years of monitoring to determine whether the flyash from the disposal site was contaminating the ground water on the rest of appellants' property. (Aug. 25, 2008, Tr. 67-69). Thus, she stated that she was not in a position at this time to make a conclusion one way or the other whether the flyash disposal site was going to impact the rest of the property. (Aug. 25, 2008, Tr. 70).

**{¶98}** Additionally, Abbot Stevenson, an OEPA inspector, testified regarding a washout at the site that had occurred years earlier. (Aug. 25, 2008, Tr. 89-90). Due to the washout, there had been concerns that leachate had leaked out and migrated down into the sand and gravel and travelled beyond the disposal site. (Aug. 25, 2008, Tr. 91-92). Stevenson opined that the deed restriction should run with the entire 132 acres during the five-year monitoring period and that after that time, the restriction should run with the five-acre tract and a buffer zone. (Aug. 25, 2008, Tr. 103).

**{¶99}** Given the testimony, the trial court's decision to apply the deed restriction to the entire 132 acres was not against the manifest weight of the evidence. Kearns, who is not a ground water expert, testified that the water flow,

according to Defendant's Exhibit 2, travelled away from appellants' property. He opined that the deed restriction should only apply to the five-acre disposal site because this was the only area that posed a risk of harm. Jacobs, who is a ground water expert, testified that the water flow could potentially flow from the disposal site to other parts of appellants' property due to the elevation levels. She also testified that it is possible for water flow to change over time. Jacobs stated that it would take five years of monitoring the wells to determine whether the flyash from the disposal site would affect the rest of appellants' property. Finally, Stevenson, an OEPA inspector, opined that the restriction should run with the entire 132 acres during the five-year monitoring period.

**{¶100}** The trial court gave more weight to Jacobs' testimony than to Kearns' testimony. Clearly, this was a matter of conflicting testimony. And when the evidence is susceptible to more than one interpretation, we must construe it consistently with the trial court's judgment. *Gerijo*, 70 Ohio St.3d at 226. Because there is competent, credible evidence to support the court's judgment, we cannot find that it is against the manifest weight of the evidence. Accordingly, appellants' fifth assignment of error is without merit.

**{¶101}** Appellants' sixth assignment of error states:

**{¶102}** "THE TRIAL COURT ERRED IN IMPOSING, WHAT IS IN EFFECT, A STATUTORY ENVIRONMENTAL COVENANT ON ALL 132 ACRES OF TRI-STATE'S REAL PROPERTY WHEN THE ENVIRONMENTAL COVENANT STATUTE, RC 5301.82, DID NOT BECOME EFFECTIVE UNTIL DECEMBER 30, 2004, SIXTEEN MONTHS AFTER THE TRIAL COURT'S JUDGMENT ENTRY IMPOSING A DEED RESTRICTION FOR INDUSTRIAL PURPOSES ONLY."

**{¶103}** Here appellants' argument does not give any reasons in support of its assigned error. Instead, appellants argue that the trial court erred by ordering more stringent deed restrictions in its March 2, 2009 judgment than it did in its September 2, 2003 judgment.

**{¶104}** In its September 2, 2003 judgment, the trial court set out ten requirements for the court-ordered Site Closure Plan. One of these requirements was for "[i]mposition of deed restriction to control use of property for industrial purposes only[.]"

**{¶105}** The actual deed restriction imposes the following limitations: (1) the property is to be used for industrial use only; (2) the integrity of any soil and vegetative cover over the disposal site must be maintained in compliance with the Site Closure Plan; (3) all leachate and erosion controls installed at the disposal site must be maintained in compliance with the Site Closure Plan; (4) the ground water monitoring wells must remain fully operational until no longer required in accordance with the Ground Water Monitoring Plan; and (5) ground water underlying the property shall not be extracted or used for any purpose unless specifically authorized by the OEPA. Thus, the restriction is more detailed than simply stating that the property is for industrial use only.

**{¶106}** But these limitations, although not spelled out as part of the deed restriction, were included in the September 2, 2003 judgment. In its requirements for the Site Closure Plan, the court, in addition to the industrial use deed restriction, also required: (1) detailed specifications for installation of the soil cover; (2) proper installation and growth of the vegetative cover; (3) re-establishment of the ground water monitoring system; (4) submittal of proposal for erosion controls; and (5) submittal of proposal for leachate controls. Therefore, the deed restriction is not more stringent than the court indicated in its September 2, 2003 judgment.

**{¶107}** Furthermore, appellants make no argument as to why this is an environmental covenant as opposed to a deed restriction.

**{¶108}** Accordingly, appellants' sixth assignment of error is without merit.

**{¶109}** Appellants' seventh assignment of error states:

**{¶110}** "THE TRIAL COURT ERRED IN FAILING TO CONSIDER, IN ARRIVING AT THE CIVIL CONTEMPT PENALTY, THE INTERNAL COSTS INCURRED BY TRI-STATE TO PERFORM CERTAIN SITE CLOSURE WORK

AFTER AUGUST, 2007 WHEN THE RECORD EVIDENCE OF THE EPA'S SITE INSPECTOR AND TRI-STATE'S PRESIDENT ESTABLISHED THE NATURE AND EXTENT OF THE WORK PERFORMED AND MATERIALS PROVIDED FOR THE SITE CLOSURE."

{¶111} Appellants argue here that the trial court failed to consider the internal costs they incurred for the trucking and equipment used to bring subsoil and topsoil to the site and re-grade the site. They assert that the trial court should have included these costs in the offset to their civil penalty.

{¶112} The trial court held a hearing on November 2, 2009, to determine the reasonable costs expended by appellants in accomplishing the clean-up objective, which would then be deducted from their civil penalty.

{¶113} At the hearing, Stevenson testified that appellants were required by the Closure Plan to, and satisfactorily did, re-grade an approximately 200,000 square-foot area. (Nov. 2, 2009, Tr. 15, 19). Stevenson further agreed that there was excavating and trucking of subsoil onto the site and that there was labor and equipment used for re-grading the subsoil. (Nov. 2, 2009, Tr. 22). Stevenson also testified that she did not receive any invoices from appellants for these items however. (Nov. 2, 2009, Tr. 26).

{¶114} Straub testified as to several items for which he did not have invoices. He testified that appellants spent $40,000 for subsoil used for re-crowning (Nov. 2, 2009, Tr. 35); $48,000 for "excavating, trucking subsoil and regarding borrow area of 8,000 tons at $6 per ton" (Nov. 2, 2009, Tr.35); $19,200 for "labor and equipment for placement and re-grading of subsoil to create resloping [sic.] and crowning of fly ash area" (Nov. 2, 2009, Tr. 37-38); $15,000 for "screening topsoil, loader and portable screening plant" (Nov. 2, 2009, Tr. 39); $53,693 for topsoil (Nov. 2, 2009, Tr. 40-41); $24,600 for "trucking, 246 trips at $50 an hour" (Nov. 2, 2009, Tr. 42); $1,000 for bales of hay (Nov. 2, 2009, Tr. 44); and $4,000 for "rip/rap material" to protect against grading (Nov. 2, 2009, Tr. 45). For all of these items, Straub explained the work that was done and how he reached the figures he did. He also testified that some of

these costs were internal and some of the work was done by outside contractors. (Nov. 2, 2009, Tr. 55). The total of these items is $204,493.

{¶115} The trial court determined that the amount of appellants' second civil penalty, plus post-judgment interest totaled $354,875. It further credited appellants $158,459.70 for reasonable costs expended to accomplishing the clean-up, leaving a balance of $196,415.30.

{¶116} This issue appears to be a weight of the evidence one. Appellants claim they proved various expenses they incurred while appellee claims they did not. Thus, the manifest weight of the evidence standard applies here.

{¶117} The trial court found that appellants "failed to establish, by a preponderance of the evidence, that certain materials were, in fact, purchased and/or certain work performed. **Rather, the testimony establishes guesstimates and/or speculation on the part of Straub as to hours worked and/or exact services provided and/or materials purchased.**" (Emphasis sic.; Aug. 23, 2010 judgment entry). The court went on to reference the specific invoices submitted by appellants, for which it credited appellants dollar-for-dollar. It then explained that it did not credit appellants for the costs testified to by Straub because (1) they were not supported by invoices or other documentation and (2) appellants did not present evidence as to if the costs were reasonable, even though the work may have been proximately related to the site clean up. Nonetheless, the court recognized that appellants expended reasonable efforts to bring about the closure of the site and, therefore, awarded appellants an additional $50,000 for the site clean up to be used to reduce the second civil penalty.

{¶118} The trial court's judgment is supported by the evidence. Appellants submitted numerous invoices documenting work they had performed in order to effectuate the Site Closure. For all of these items, the court credited appellants. But for numerous other items, appellants presented only Straub's testimony. They provided no documentation or invoices showing the money spent. It was not unreasonable for the court to choose to accept the documented costs and reject the

undocumented costs.   As the court noted, Straub's testimony was somewhat speculative on these items and he testified that many of the costs were "internal."

**{¶119}**   Accordingly, appellants' seventh assignment of error is without merit.

**{¶120}**   For the reasons stated above, the trial court's judgments are hereby affirmed.

Waite, P.J., concurs.

DeGenaro, J., concurs.